IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 10-cv-03086-CMA-BNB

GODWIN ABIAKAM,

Plaintiff,

v.

QWEST CORPORATION,

Defendant.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

This matter arises on **Qwest's Motion for Summary Judgment and Supporting Brief** [Doc. #30, filed 10/14/2011] (the "Motion"). I respectfully RECOMMEND that the Motion be GRANTED.

## I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe his pleadings. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). I cannot act as advocate for a *pro se* litigant, however, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment shall be rendered "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.  Only admissible evidence may be considered when ruling on a motion for summary judgment.  World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.   UNDISPUTED MATERIAL FACTS[1]

1.   The plaintiff was employed by Qwest from April 5, 1999, until March 14, 2008.

*Scheduling Order* [Doc. #22], § 3(a) and (h).

2.   The plaintiff was employed as a Network Technician.  Network Technicians install

and repair phone and internet service for residential and small business customers.  Id. at § 3(b);

*Complaint*, second consecutive attachment, ¶ A; *Motion*, first consecutive attachment [Doc. 30-

1], ¶ 2.[2]

3.   The plaintiff's employment was terminated for misconduct after an investigation

revealed that he was going home several times each workday while on the clock.  During a two

month period from January 3, 2008, through March 7, 2008, the plaintiff spent 87 hours during

the work day at home and charged the company for that time.  On 29 of the 43 workdays during

that two month period, the plaintiff charged overtime at time-and-a-half to complete his

workload.  *Motion*, first consecutive attachment [Doc. #30-1], ¶ 9.

---

[1]The defendant's Motion sets forth a Statement of Undisputed Facts, which is supported by exhibits, including affidavits of Qwest employees.  The plaintiff's response to the Motion does not contain any supporting evidence.  Under C.D. Mosier v. Maynard, 937 F.2d 1521, 1524 (10th Cir. 1992), a plaintiff's complaint may be treated as an affidavit under Fed.R.Civ.P. 56(e) to the extent it contains statements that are based on personal knowledge and those statements have been sworn under penalty of perjury.  The allegations of the Complaint are not sworn.  However, attached to the Complaint is the plaintiff's Charge of Discrimination which contains factual statements sworn under penalty of perjury.  I have relied on the factual assertions in the Charge of Discrimination to the extent they are based on personal knowledge and to the extent they support factual statements asserted in the plaintiff's response to the summary judgment motion.

[2]None of the attachments to the defendant's Motion are labeled.  Therefore, I cite to the attachments by the order they are attached to the Motion and by the document number provided by the court's docketing system.

4.   Network Technicians are exempt, hourly employees, eligible for overtime at time-and-a-half for hours worked in excess of 40 per week.  Technicians report their own time and work alone and unsupervised.  Qwest relies on Technicians to be honest, follow company policies, accurately report their time worked, and not deviate by more than a mile from their assigned routes and jobs during the day.  Id. at ¶¶ 2-3, 7; fifth consecutive attachment [Doc. #30-5], 31:12-15; 136:15-25.

5.   The plaintiff was a member of the Communication Workers of America (the "Union"), and his employment was covered by a Collective Bargaining Agreement which contains a grievance and arbitration process.  *Motion*, fifth consecutive attachment [Doc. #30-5], 36:2-4 and first exhibit [Doc. #30-7], Articles 16 and 17.

6.   The Union did not arbitrate the plaintiff's termination.  *Motion*, first consecutive attachment [Doc. #30-1], ¶ 25.

7.   Durelle Reigies was the plaintiff's supervisor from approximately January 1, 2004, to August 25, 2007, and again from November 4, 2007, until January 12, 2008.  *Scheduling Order* [Doc. 22], § 3(e).

8.   David Bruce was the plaintiff's supervisor from approximately August 26, 2007, until November 3, 2007.  Id. at § 3(f).

9.   Mitch Maley was the plaintiff's supervisor from January 13, 2008, until the plaintiff's termination on March 14, 2008.  Id. at § 3(g).

10.   Section 2.1 of the Collective Bargaining Agreement provides: "Except as otherwise provided in this Agreement, Employees shall not be paid for time not worked."  *Motion*, fifth consecutive attachment [Doc. #30-5] and first exhibit [Doc. #30-7].

11.   The Qwest Code of Conduct ("Code") required that all employees accurately report their regular and overtime hours.  The plaintiff reviewed and acknowledged the Code every year. *Scheduling Order* [Doc. 22], § 3(c) and (d).

12.   The plaintiff reviewed and acknowledged a copy of Qwest's Break and Lunch Policy on February 20, 2007.  That Policy provides:

> a.   Breaks are 15 minutes including travel time.  One break will be in the AM and one break will be in the PM.
>
> b.   Breaks will not be taken prior to the completion of your first job.
>
> c.   Breaks will not be accumulated or taken in conjunction with lunch periods, other breaks or shift ending time.
>
> d.   Breaks are to be taken at work sites unless the stop is on the most direct route between jobs.
>
> e.   It is strongly suggested that Network Technicians bring their lunch.
>
> f.   Lunch is to be 30 minutes, including travel time.

*Motion*, fifth consecutive attachment [Doc. #30-5], 101:2-23 and second exhibit [Doc. #30-8].

13.   On February 20, 2007, the plaintiff reviewed and acknowledged the 2007 Technicians' Expectations which provides: "Do not travel out of route for lunch or breaks for more than 1 mile." Id. at 148:18-149:5; 153:7-11 and third exhibit [Doc. #30-9], p. 3.

14.   On March 7, 2008, the plaintiff's supervisor, Mitchell Maley, received a call from the plaintiff at approximately 2:00 p.m. requesting overtime to complete his workload.  Mr. Maley told the plaintiff that he would try to move his last job to another employee and did not authorize him to work overtime.  When Mr. Maley and the plaintiff spoke at approximately 4:12 p.m., the plaintiff said that he was already at the job site and he would handle his last job himself. *Motion*, first consecutive attachment [Doc. #30-1], ¶ 10.

15.   The next day, Mr. Maley reviewed the plaintiff's time card and noticed that the plaintiff had charged an hour-and-a-half of overtime.  Mr. Maley spoke to the plaintiff about the overtime.  When the plaintiff did not provide a logical explanation, Mr. Maley reviewed his GPS and job records for March 7, 2008.  Id. at ¶ 11.

16.   Mr. Maley discovered that the plaintiff had gone home or to his cousin's home (collectively, "home") three times on March 7, spending 3.33 hours of his workday either at home or traveling to and from home.  Id. at ¶ 16.

17.   Mr. Maley found that at 4:11 p.m., when the plaintiff told him that he had just arrived at the jobsite, he had, in fact, already finished the job, left the premises, and was on his way to his cousin's house.  The plaintiff drove 8.6 miles past the garage to his cousin's home where he stayed until 5:25 p.m.  He then drove back to the garage and clocked out, charging an hour-and-a-half overtime for the day.  Id. at ¶ 15; fifth consecutive attachment [Doc. #30-5], 91:9-20.

18.   Mr. Maley also noticed that the plaintiff had gone home twice during the morning of March 7.  Instead of going to his first job when he left the garage, as required by Qwest policy, the plaintiff drove 6.9 miles out of his route and went home for 54 minutes (including travel time).  Id. at first consecutive attachment [Doc. #30-1], ¶ 16; fifth consecutive attachment [Doc. #30-5], 95:3-21.

19.   At 10:13, the plaintiff again went home.  He drove 4.1 miles out of route and spent 48 minutes at home (including travel time) before arriving at his next customer's house.  At 11:23 a.m., the plaintiff went to his cousin's house--4.2 miles outside his assigned route--and

spent 40 minutes there.  Id. at first consecutive attachment [Doc. #30-1], ¶ 16; fifth consecutive

attachment [Doc. #30-5], 97:9-11.

20.   Including the hour he spent at his cousin's house at the end of the day, the plaintiff

spent 3.33 hours at his home or his cousin's home or traveling to and from those locations while

on the clock.  Id. at first consecutive attachment [Doc. #30-1], ¶ 16.

21.   Mr. Maley and another supervisor, Trevor Crandall, reviewed the plaintiff's GPS

and job records for the 43 days that the plaintiff worked during the two month period January 3,

2008, through March 7, 2008.  Id. at ¶¶ 9, 17.

22.   The investigation revealed that the plaintiff went home or to his cousin's home

several times each day during this two month period, spending 87 hours (almost 11 full work

days) at home or at his cousin's home when he should have been working.  The plaintiff was

paid for all this time and was paid overtime to complete his workload on 29 of the 43 work days

examined.  Id. at ¶ 9.

23.   Nearly every morning, the plaintiff clocked in at approximately 8:00 a.m. and then

drove home, in violation of the Break Policy which prohibits taking the morning break before the

first job.  He spent an average of 34 minutes per day at home in the morning before proceeding

to his first job.  Id. at first consecutive attachment [Doc. #30-1], ¶ 18; fifth consecutive

attachment [Doc. #30-5], 95:6-9.

24.   The plaintiff also traveled several miles out of route to go home for lunch on 36 of

the 43 work days examined.  He spent an average of 50 minutes per day at home for lunch.  Id. at

first consecutive attachment, ¶ 19.  The plaintiff cannot recall whether he took more than 30

minutes for his lunch break.  Id. at fifth consecutive attachment [Doc. #30-5], 173:20-23.

25.   Most afternoons between January 3, 2008, and March 7, 2008, the plaintiff traveled several miles out of route to go home or to his cousin's home.  He spent an average of 50 minutes per afternoon at home. Id. at first consecutive attachment [Doc. #30-1], ¶ 20.

26.   The plaintiff was interviewed during the investigation.  He denied that he regularly went home during the workday.  Id. at first consecutive attachment [Doc. #30-1], ¶ 20.

27.   The plaintiff now admits that he went home or to his sister's house at least three times a day.  Id. at fifth consecutive attachment [Doc. #30-5], 115:18-22.

28.   The results of the investigation were reviewed by Mr. Maley's manager, Russell Wood; Human Resources Manager, Melissa Schaus; and Mr. Wood's manager, Richard Mabry. David Bruce was not involved in the investigation or the decision to discharge the plaintiff.  Mr. Mabry made the decision to terminate the plaintiff's employment.  Id. at first consecutive attachment [Doc. #30-1], ¶ 23.

29.   The plaintiff admits that he charged Qwest for the time he spent at home and that he did not consider that time to be part of his breaks or lunches.  Id. at fifth consecutive attachment [Doc. #30-5], 295:18-25.

30.   The plaintiff claims he asked his supervisor for permission to go "out of route" each time he went home, but admits he didn't tell his supervisors how long he would be there.  Id. at 172:13-24.  The plaintiff's supervisors recall that the plaintiff may have infrequently requested permission to go home to get his cell phone or wallet but deny that he told them he was going home regularly.  Id. at second consecutive attachment [Doc. #30-2], ¶ 3; first consecutive attachment [Doc. #30-1], ¶ 22.

31.   The plaintiff cannot identify any other employee who engaged in similar misconduct.  At most, he says that sometimes he saw other technicians in coffee shops.  Id. at fifth consecutive attachment [Doc. #30-5], 284:25 – 285:6.

32.   The plaintiff has no specific information regarding dates or locations and doesn't know whether these technicians were on break or more than a mile outside of their routes.  Id. at 285:7-16.

33.   The plaintiff has no evidence that any supervisor knew that another technician violated Qwest's policies.  Id. at 294:12-17.

34.   At least 14 other technicians in Richard Mabry's organization were discharged for deviating from their work routes, misreporting their time, and engaging in misconduct similar to the plaintiff's.  Id. at third consecutive attachment [Doc. #30-3], ¶ 6; fourth consecutive attachment [Doc. #30-4], ¶ 6.

35.   Nine of the fourteen discharged technicians were White.  None were Black or from Africa.  Id.

36.   Each year, the plaintiff took an extended trip to Africa.  Qwest permitted him to use all his vacation at once and granted unpaid leave for these trips.  Qwest was not required to grant unpaid leave.  Id. at fifth consecutive attachment [Doc. #30-5], 184:22-185:8; second consecutive attachment [Doc. #30-2], ¶ 4.

37.   In 2004 and 2007, the plaintiff was several days late in returning to work because he became ill while he was in Nigeria.  Id. at fifth consecutive attachment [Doc. #30-5], 186:1-11; second consecutive attachment [Doc. #30-2], ¶¶ 5-6.

38.   The plaintiff did not contact Qwest before his scheduled return dates to let his manager, Durelle Reigies, know he'd be late in returning.  Id. at second consecutive attachment [Doc. #30-2], ¶¶ 5-6.

39.   In 2007, the plaintiff's cousin, Helen Onohua, eventually contacted the plaintiff's manager, but not until after his scheduled return date.  Id.; sixth consecutive attachment [Doc. #30-6], 34:19-23.

40.   Prior to his 2008 trip, the plaintiff's manager, Mitch Maley, and his former manager, David Bruce, met with the plaintiff to review the company's policy requiring employees to notify the company in advance of absences.  They gave the plaintiff a memo outlining the policy and reminded him that his job could be in jeopardy if he failed to notify the company that he would not be back to work on time.  Id. at first consecutive attachment [Doc. #30-1], ¶ 26; Complaint, second consecutive attachment [Doc. #30-2], ¶ L.

41.   The plaintiff found Bruce's and Maley's request offensive and refused to sign the memo.  Complaint, second consecutive attachment [Doc. #30-2], ¶ L.

42.   The plaintiff does not know of any other technicians who took extended vacations or were late in returning from extended vacations.  He asked a fellow technician, Cory Johnson, whether he had ever been asked to sign such a document, and Johnson said no.  Mr. Johnson is African-American.  Id. at first consecutive attachment [Doc. #30-1], ¶ 29; fifth consecutive attachment [Doc. #30-5], 206:1 – 207:3.

43.   The plaintiff made a complaint to the Qwest corporate affairs about Mr. Bruce shortly after the meeting on February 29, 2008.  The plaintiff did not complain about any actions by Maley or by those involved in the investigation of his misconduct and decision to discharge

him--Richard Mabry, Russell Woods, Trevor Crandall or Melissa Schaus.  *Motion*, final exhibit

to fifth consecutive attachment [Doc. #30-13]; *Complaint*, second consecutive attachment, ¶ O.[3]

### III.  ANALYSIS

The plaintiff claims that he was terminated from his employment at Qwest because of his

race, color, and national origin, and in retaliation for complaining about discriminatory

behaviors.  He also claims that he was subjected to a hostile environment.  *Complaint*, pp. 2, 7-

10.

Title 42, U.S.C., provides in relevant part, that "[i]t shall be an unlawful employment

practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religions, sex, or national

origin  . . . ."  42 U.S.C. § 2000e-2(a)(1) (1994).  "Although Title VII does not explicitly mention

hostile work environment, a victim of a racially hostile work environment may nevertheless

bring a cause of action under Title VII."  Ford v. West, 222 F.3d 767, 775 (10th Cir. 2000) (citing

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986); Bolden v. PRC Inc., 43 F.3d 545,

550 (10th Cir.1994)).  Title VII also prohibits retaliation against individuals who oppose

discriminatory employment practices or participate in complaints or investigations of

employment practices prohibited by title VII.  42 U.S.C. § 2000e-3(a).

---

[3]Document #30-13 appears to be a summary of a call from the plaintiff to Qwest
complaining of harassment by David Bruce. The plaintiff attaches to his response a copy of the
same summary, and he refers to it as evidence of his "formal complaint with Quest [sic]
Corporate Affairs."  *Plaintiff's Response to Defendant's Motion for Summary Judgment* [Doc.
#38], p. 7.  The documents are not authenticated.  However, because both parties agree that the
document represents a summary of the plaintiff's complaint to Qwest, I have considered the
document in my consideration of the Motion.

### A.   Discriminatory Discharge and Retaliation

To establish a claim of discrimination, the plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); James v. Sears, Roebuck and Co., Inc., 21 F.3d 989, 992 (10th Cir. 1994).  If this burden is met, the burden shifts to the employer to establish a legitimate, nondiscriminatory reason for its conduct.  St. Mary's Honor Center, 509 U.S. at 506-07; James, 21 F.3d at 992.  If the employer meets its burden, the plaintiff must then prove by a preponderance of the evidence that the employer's reasons for its conduct are pretext for intentional discrimination.  St. Mary's Honor Center, 509 U.S. at 515-16; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Cone v. Longmont United Hosp. Assoc., 14 F.3d 526, 529 (10th Cir. 1994).

A *prima facie* case of national origin, color, and race-based discriminatory discharge requires a showing that: (1) the employee belongs to a protected class; (2) the employee was qualified for the position; (3) the employee was discharged; and (4) the employee's position was not eliminated after the discharge.  St. Mary's Honor Center, 509 U.S. at 506; Shapolia v. Los Alamos Nat. Lab., 992 F.2d 1033, 1038 (10th Cir. 1993).

It is undisputed that the plaintiff is a member of a protected class and that he was qualified for the position of a network technician.  *Motion*, p. 11.  The plaintiff states under oath that he was discharged from his position because he is a black Nigerian immigrant.  *Complaint*, second consecutive attachment, ¶ C.  The plaintiff has met his burden of demonstrating a *prima facie* case of discriminatory discharge.

12

To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  Sanchez v. Denver Public Schools, 164 F.3d 527, 533 (10th Cir. 1998).  The plaintiff bears the burden of establishing the *prima facie* case.  Id.

The defendant does not dispute that the plaintiff engaged in protected opposition to discrimination when he made a complaint to Qwest corporate affairs shortly after the meeting on February 29, 2008.  *Motion*, p. 15.  Further, it is undisputed that he suffered an adverse employment action in the form of termination from his job.  The circuit court has stated the following with regard to the causal connection requirement:

> A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation.  We have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation.  By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation.

O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) (internal quotations and citations omitted).

The plaintiff states under oath that he was terminated on or about March 13, 2008, because he made a complaint to the Qwest corporate affairs shortly after the meeting on February 29, 2008.  *Complaint*, second consecutive attachment, ¶¶ O and S.  Under O'Neal, the plaintiff has established the causation prong because approximately one and one-half months

elapsed between the protected activity and the adverse action.  The plaintiff has, therefore, established a *prima facie* case of retaliation.

"Under the McDonnell Douglas scheme, "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." St. Mary's Honor Center, 509 U.S. at 506.  The burden now shifts to the defendant to provide evidence of a legitimate, non-discriminatory reason for plaintiff's discharge.  To satisfy this burden, defendant need only produce evidence that would allow the trier of fact to conclude that plaintiff's discharge was not motivated by discrimination.  Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1279 (10th Cir. 1999).

The defendant has produced uncontroverted evidence that the plaintiff was terminated because he violated company policy when he went off-route to go home or to his cousin's home a total of 87 hours between January 3, 2008, and March 7, 2008; he charged Qwest for the time he spent at home or at his cousin's home; and he charged Qwest overtime to complete his workload on 29 of the 43 work dayps examined.  The defendant also produced uncontroverted evidence that at least 14 other technicians in Mr. Mabry's organization were discharged for deviating from their work routes, misreporting their time, and engaging in misconduct similar to the plaintiff's misconduct, and that none of these technicians were black or from Africa. Therefore, the defendant has succeeded in producing a legitimate, nondiscriminatory reason for terminating the plaintiff's employment.

Consequently, the presumption of discrimination disappears and the burden shifts back to the plaintiff to prove that the defendant's reasons for terminating him are pretext for intentional discrimination:

> A plaintiff demonstrates pretext by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. Evidence of pretext may include prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating ⋯ criteria); and the use of subjective criteria.

Jaramillo v. Colorado Judicial Dept., 427 F.3d 1303, 1306-07 (10th Cir. 2005) (en banc) (internal quotations and citations omitted).

The plaintiff has not produced any evidence to show that the defendant's stated reasons for terminating him are pretext for retaliatory or discriminatory discharge. He merely repeats the conclusory and unsupported allegations of the Complaint. *Plaintiff's Response to Defendant's Motion for Summary Judgment* [Doc. #38] (the "Response"). For example, he summarily states that "no other technicians were subjected to the same kind of discrimination . . . ." Id. at pp. 2, 5; *Complaint*, second consecutive attachment, ¶ T. However, he does not provide any evidence to refute the defendant's showing that at least 14 other technicians in Mr. Mabry's organization were discharged for engaging in misconduct similar to the plaintiff's misconduct, and that none of these technicians were black or from Africa. He also summarily states that "Ms. Patterson approved every instance of being off-route." *Response*, p. 5; *Complaint*, second consecutive attachment, ¶ T. He does not provide any evidence to explain Ms. Patterson's job title; whether she had the authority to approve off-route requests; or any other information to show that she approved 87 off-route hours between January 3, 2008, and March 7, 2008.

The plaintiff also complains of discriminatory treatment by Mr. Bruce and Mr. Maley prior to his termination. He asserts that they discriminated against him when they forced him to

sign a document stating that he would return on time from his upcoming trip to Nigeria. *Response*, pp. 4-5; *Complaint*, second consecutive attachment, ¶¶ L-O.   However, the plaintiff has not demonstrated that the requirement to sign the document was based on discriminatory motive.   To the contrary, it is undisputed that the plaintiff was required to sign the document because he failed to timely return from trips to Nigeria in 2004 and 2007, and he failed to contact Qwest before his scheduled return dates to let his manager know he would be late in returning. It is also undisputed that the plaintiff does not know of any other technicians who took extended vacations or were late in returning from extended vacations.   Consequently, the incident is not helpful in establishing that the defendant's reasons for firing him are pretext for discrimination.

The plaintiff further asserts that the following actions by Mr. Bruce and Mr. Maley show that Qwest's reasons for firing him are pretextual:

1.   In September or October 2007, Mr. Bruce "wrote [the plaintiff] up for not meeting [his] quota for the month" without allowing the plaintiff "an opportunity to contest the write-up pursuant to company policy." *Response*, p. 3; *Complaint*, second consecutive attachment, ¶ E.

2.   Toward the end of January 2008, Mr. Bruce began visiting the plaintiff's job sites unannounced "to try and trap [the plaintiff] with mistakes - a practice he did not employ with other technicians." *Response*, p. 3; *Complaint*, second consecutive attachment, ¶ F.

3.   On one occasion, Mr. Bruce showed up at the job site unannounced and accused the plaintiff of not locking his truck doors or setting out a warning cone.   The plaintiff tried to explain that he had just arrived at the job site, but Mr. Bruce did not listen.   Before he left, Mr. Bruce told the plaintiff that he "must be dealt with" and that he was going to make sure the plaintiff would "lose this job, bitch." Id.

4.   On several occasions, Mr. Bruce denied the plaintiff tools he needed to complete jobs, which reduced the plaintiff's productivity.  *Response*, p. 3; *Complaint*, second consecutive attachment, ¶ G.

5.   On one occasion, the plaintiff was forced to use a defective computer "that was absolutely necessary in order to efficiently complete [his] jobs."  He was left "without a computer to complete basic tests for over one (1) month before it was fixed or replaced." "Again, Bruce engaged in tactics which directly affect my productivity in a negative way." *Response*, pp. 3-4; *Complaint*, second consecutive attachment, ¶ H.

6.   Mitch Maley began to supervise the plaintiff in February 2008.  Mr. Maley "continued to question and monitor every aspect of [the plaintiff's] work."  *Response*, p. 4; *Complaint*, second consecutive attachment, ¶ I..

7.   On one occasion, Mr. Maley asked where the plaintiff was from.  The plaintiff told him he was from Nigeria.  Mr. Maley responded that the plaintiff "must be a king in [his] country making this type of money."  *Response*, p. 4; *Complaint*, second consecutive attachment, ¶¶ J, K.

8.   Before the plaintiff left, Mr. Maley told him that if he "reported his termination to anyone or went to any court of law that [he could] never work for Qwest again."  Mr. Maley also referred to the plaintiff as a "bitch."  *Response*, p. 5; *Complaint*, second consecutive attachment, ¶ T.

These incidents do not establish that the defendant's reasons for firing the plaintiff are pretext for discrimination.  The allegations do not speak to the defendant's showing that the plaintiff repeatedly and flagrantly violated company policy by going home or to his cousin's

home for 87 hours during a two month period of time.  Moreover, the allegations do not show

that Mr. Bruce's or Mr. Maley's comments and actions were motivated by race, color, or

national origin discrimination.  Messrs. Bruce and Maley's close monitoring of the plaintiff,

without more, does not infer discrimination.  Although the term "bitch" may give rise to an

inference of discrimination based on sex, E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 799 (10th Cir.

2007), the term does not implicate racial animus.  Similarly, Mr. Maley's comment that the

plaintiff "must be a king in [his] country making this type of money" does not evidence racial

bias.

 "In some instances, evidence of discriminatory comments may be relevant to the issue of

pretext."  Wood v. City of Topeka, Kansas, 17 Fed.Appx. 765, 768, 2001 WL 649219 at *3 (10th

Cir. June 12, 2001) (citing Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209-10 (10th

Cir.1999)).  However, "[t]o be significant evidence of pretext . . . objectionable conduct or

remarks should be attributable to an individual responsible for the employment decision."  Id.

(citing Kendrick v. Penske Trans. Serv., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000)).  It is

undisputed that Mr. Mabry--not Mr. Bruce or Mr. Maley--made the decision to terminate the

plaintiff's employment.

 Finally, other than a conclusory and self-serving statement made in his Charge of

Discrimination that "no other technicians were treated in this manner," the plaintiff does not

have any evidence to show that similarly situated employees who do not belong to the protected

class were treated differently.

 The plaintiff argues that under Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), he is

entitled to a "mixed-motive analysis" if he shows "that race, color, national origin, sex, or

religion was one of the factors motivating the challenged decision." *Response*, p. 6.  In Desert

Palace, the Court held that under the Civil Rights Act of 1991, a plaintiff could establish an

unlawful employment practice through either direct or circumstantial evidence by demonstrating

that race, color, or national origin was a motivating factor, even though other factors motivated

the practice.  Id. at 99.

      In this case, the plaintiff has not established through either direct or circumstantial

evidence that race, color, or national origin was a motivating factor for his termination from

Qwest.  Nor has he shown that he was terminated in retaliation for making a complaint to Qwest

corporate affairs.  Accordingly, the Motion should be granted insofar as it seeks judgment in

favor of the defendant on the plaintiff's claims for discriminatory discharge and retaliation.

### B.  Hostile Work Environment

      To survive summary judgment on a hostile work environment claim, a plaintiff must

meet two criteria.  First, the plaintiff must show that "'under the totality of the circumstances, the

harassment was pervasive or severe enough to alter the terms, conditions, or privilege of

employment.'"  Trujillo v. University of Colorado Health Sciences Center, 157 F.3d 1211, 1214

(10th Cir. 1998) (quoting Bolden v. PRC Inc., 43 F.3d 545, 550 (10th Cir.1994) citing Meritor

Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)).  The court must look at all circumstances

including "the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance."  Id.  Second, the plaintiff must show that "'the

harassment was racial or stemmed from racial animus.'"  Id. (quoting Bolden v. PRC Inc., 43

F.3d 545, 550 (10th Cir.1994) citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)).

Here, the plaintiff does not specify the conduct that constituted a hostile work environment. *Response*, pp. 10-11. Assuming he includes all of the behaviors listed above, I have already found that he has failed to show that the conduct stemmed from race, color, or national origin discrimination.

At the summary judgment stage, the plaintiff must provide evidence of specific facts showing that there is a genuine issue for trial. Considering the totality of circumstances alleged by the plaintiff, I find that he has failed to create a material factual dispute regarding whether he was subjected to severe and pervasive harassment based on his race, color, or national origin. If the nature of the plaintiff's work environment, however unpleasant, is not due to his race, color, or national origin, then he has not been the victim of discrimination as a result of that environment. See Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir. 1994). The Motion should be granted insofar as it seeks summary judgment in favor of the defendant on the plaintiff's allegations of a hostile work environment.

## IV.  CONCLUSION

I respectfully RECOMMEND that Qwest's Motion for Summary Judgment and Supporting Brief [Doc. #30] be GRANTED and that summary judgment enter in favor of the defendant on all of the plaintiff's claims.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections

waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); Thomas

v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal

questions.  In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A

party's objections to this recommendation must be both timely and specific to preserve an issue

for *de novo* review by the district court or for appellate review.  United States v. One Parcel of

Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

      Dated April 12, 2012.

BY THE COURT:

 s/ Boyd N. Boland           
United States Magistrate Judge